Teri Woods Publishing v. Amazon, Inc. Mr. Ewing, you have reserved two minutes for rebuttal, I believe. That is, in fact, that's correct, Your Honor. You have eight minutes to start. You may proceed. Good morning. Bruce Ewing with Dorsey & Whitney for the plaintiff, sorry, the appellant, Teri Woods Publishing. May it please the Court, there are many words that could be used to describe this four-page license agreement between my client and the appellee Urban Audiobooks and, by extension, the other appellees, but unambiguous is not one of them. Yet the district court held otherwise, treating the agreement as unambiguous in every respect that's material to this case. That decision was wrong. The district court's decision conflicts with the text, structure, and purpose of the license. At the least, the terms of the license are ambiguous, and accordingly, this court should reverse the decision below and allow Woods Publishing's copyright infringement claims to the court. But not every ambiguity in a contract converts a contract dispute to a copyright dispute. You'd agree with that? I agree with that. Yes, Your Honor. And so Section 1 of this contract is pretty broad and pretty straightforward as to the reach of this agreement in terms of distribution. You agree with that? You're not suggesting that Section 1 bars streaming? No, we are not suggesting that. What it bars, when read in combination with Section 2, as it must be, is that it bars free distribution and it bars subscription plans. You must read Section 1 with Section 2 together. You can't view them in isolation. But why? Why isn't it equally plausible that whether a subscription plan falls under Section 2a or 2b, maybe there is an ambiguity there as to whether it gets compensated under 10% or 25% of net receipts. But it's not clear to me why that has anything to do with the scope of the license. If subscription plans don't fit in Section 2a, 2a or 2b, then it doesn't fit within the agreement at all. But what would suggest that subscription plans don't fit under Section 1? Under Section 1? Yes, Section 1 talks about basically the authority to distribute, you know, basically copies on all mediums and means, known or hereafter developed. But if you look at it, it says cassette, CD, MP3 CD, preloaded devices, as Internet downloads. So we're talking about technology there. We're not talking about a format like a subscription plan. Subscription plan does not fit. A subscription plan is not a contrivance. It's not an appliance. It's not a medium. It's not a means. But the scope of the license, I mean, doesn't say anything about subscription plans or any of the other things that are covered under Section 2, right? No, actually, that's not true. Section 2a speaks of catalog, wholesale and other retail sales of the audio recordings of said literary work. And then it refers to downloads. So why isn't this then just a retail sale or rental? Because a subscription plan isn't a sale. You don't pay to read a book, to read the audio book. You pay to join the plan. You pay a membership fee, and then you get access to various publications. But what Section 2 speaks of is paying royalties. We've offered to you various dictionary definitions that define royalties. So I'm clear about this. If they sold to a library and the library then allows people to take out the MP3 player or to take out the digital download, your view is that would be a breach. That's beyond the scope of this license agreement. If it was a, I mean, yes, it would be, because there would be no- You can't sell to libraries. That's your view. That's your interpretation of Section 2. If you sold the books on a per unit or per work- On an MP3. Sure. One work sold to a library, that's a sale. A whole subscription plan where there is no sale, there's just a payment made by members of the library, that's the problem here. They just don't fit. Again, it's not so much who the customer is, but it's how the distribution format is set up. What I don't understand is your argument focuses on how the finances of the distribution are structured vis-à-vis the end user. But the contract that we're looking at here structures an agreement between the copyright holder and the initial licensee, and royalties are described in terms of receipts to the initial licensee. It doesn't really say anything about how it's distributed. If you had a subscription plan, but the way that royalties were paid upstream is that every time somebody opened up a work, or at least a unique new user opened up a work, a payment that was sort of equivalent to the single work royalty that you might otherwise expect, got sent upstream, would you be arguing that that was a violation of the license? No, but that's not what's happening here. What's happening here is membership fees are being paid. Ms. Wood's works are being advertised as being available for free with your subscription. Okay, but now you're telling me, I'm saying let's assume that that's the structure as between Audible and its listeners. But the way Audible is paying for its license is to pay money upstream whenever one of its free users logs on, right? We don't know how Audible is paying. All right, so the problem here is that you don't have the information you need to make an allegation that these are being distributed royalty free, which is really your argument. There was no discovery here, obviously. It was a motion to dismiss. We received opaque royalty statements from Audible that were not clear at all. They actually speak of sales as being in units. But you have an accounting right under this contract, right? No, only partial. We got some statements. We tried to do an audit, but Audible refused to cooperate. But these are all contract. I mean, look, you might have a really good contract argument here. It's just that's not a copyright claim, and that's not federal court, right, because you don't have complete diversity here, right? No. It is if you've exceeded the scope of the grant. No, I get that. That's your whole hook to get in here. Yes. But if we don't buy that, it's not like you're out of luck. Then you just get to make these arguments as part of a contract, which is that they are not paying the royalties that they owe you based on their net receipts, that they haven't identified what their streaming rate is, which seems to be the key variable that they've given you no clue on. You might be able to make really strong arguments that you're entitled to sort of whatever they get on a per-minute basis. But we don't have a contract with Amazon or with Audible. We have a contract with Urban Audiobooks. The only way to bring a claim against those two entities is for copyright infringement because those two entities have used the works in ways that Ms. Woods never authorized. But Section 1 allows them to sublicense basically without discretion, right? It does allow for sublicensing, yes, and they are bound by the agreement in the same way. But we don't have a direct contractual relationship with them. And in fact, they've taken the position when we tried to look at their books that we don't have an agreement with you. We have an agreement with Urban Audiobooks, so we're not going to tell you anything. That's the problem here, and that's why this is a case of copyright infringement. I mean, that wouldn't mean that you're not entitled to perhaps third-party discovery in a contract case, right? You can certainly get third-party discovery in a contract case or in many cases. But I think the problem here is these defendants have argued that they are essentially shielded from liability. And the only way for Ms. Woods to find out what happened here and to get the recovery that she's entitled to is by bringing claims for copyright infringement. They exceeded the scope of the grant. The works were being given away for free, for example. Well, when you say the works, this is, again, going back to the consumer-facing versus royalty-facing. Is it that they're being given away to the ultimate consumer for free or that they're being given away to the ultimate consumer for, you believe, no royalty payment going upstream? We have no idea. But if that were your – if you did, that would – I mean, I totally get the notion that that might exceed the scope of the license. I guess we've got a dilemma around discovery here. Yes, that's – we have many dilemmas, but that would certainly be one of them. But it seems to me that focusing on the – how it's delivered to the ultimate user is a distraction from the question of whether it can be delivered royalty-free, which is different from how Audible structures its commercial relationship with the people to whom it's delivering this property. Yes. I mean, look, we had no discovery here. This was dismissed on motion. The agreement we submit to you is ambiguous in multiple respects. For example, it uses the term royalties. We've offered to you dictionary definitions of the term royalties, which are paid on a per-unit or per-copy basis, not for a blanket payment for streams. The appearance of that term in Section 2 makes clear that at the barest minimum there's an ambiguity in this agreement that warrants the case going forward. It shouldn't have been decided as a matter of law at this stage. Like most of the cases we've cited, of all the cases that we've put before the Court of Chapman, Ticini, of course Spinelli, these are all cases in which this Court or district courts found there are issues of fact here. We're not sure how to read this agreement. It's ambiguous. The Amy Axelrod case may be the closest on point. In that case, what the plaintiffs argued was, hey, we didn't give permission to take our works and rebind them, which resulted in lower royalties being paid. Judge Coates said that states a claim for copyright infringement if that's in fact what happened, and she allowed it to go forward. The same result should have obtained here. So the decision below in that sense was erroneous. To come back, if I may, to one point, Woods Publishing pleaded that the appellees had exceeded the scope of the license by allowing subscribers to access audiobook versions at no charge. We pleaded that repeatedly in our complaint. The district court briefly acknowledged that this was in fact part of the complaint. No, you're not really even alleging. I mean, I bet you use that term over and over, yes. But what you're really saying is that they get a subscription fee that allows a subscriber to pay a monthly fee and then get access to titles, and then if they like what, you know, after five minutes or whatever it is, then if they like it, then they can use a unit to get the book, right? No. What we're saying is what's on page 45 of the joint appendix where it says audiobook, $0. That's what was happening in this case. There was no permission ever given by Ms. Woods to have her works advertised at $0, especially when on the same page it charges hardcover prices of $250 and $20 for a paperback version. This is very similar in that sense, you know, to Spinelli. But it's really not. Spinelli, there was no income at all flowing back. Here, you're not happy with the income because you're saying that the subscription fee doesn't generate the royalties that you would get on a per unit basis. But there's nothing in the contract that said anything about a per unit basis, is there? What the contract says is that she's supposed to get paid royalties. It doesn't say anything about free distribution at all. That would be antithetical to the purpose of the license. So you've reserved two minutes for a rebuttal. I have. Thank you. Thank you, Mr. Wakefield. Thank you. Good morning, your honors. May it please the court. I'm Jed Wakefield representing Audible and Amazon, but presenting arguments for appellees. This court cautioned in Spinelli that a plaintiff cannot proceed on a copyright infringement claim simply by repackaging a claim for royalties as a claim that the alleged infringer exceeded the scope of the license. That's exactly what is happening in this case. But I gather part of the claim here is the license, a condition, not a covenant accompanying, but a condition of the license, is that my copyrighted work not be distributed without payment to me, other than within some limited exceptions.  And they're limited to excerpts up to 7,500 words, et cetera, et cetera. But would you take the position that if your client distributed these works without ever paying a royalty of the chain, that that would be a contract issue, a breach of a covenant, and not exceeding the scope of the license? I would, your honor. Because we have to look at the structure and language of the license agreement and distinguish between the grants that are present, the grant of rights, which is unfettered and broad and has no reference to pricing models, and then the royalty provision, which if there is a breach, entitles the plaintiff, the contracted party, to be put in the position it would have been in had the contract been performed. Okay, so you're saying Spinelli, I mean, the distinction we just heard with Spinelli was in that case there was no money flowing upstream, whereas for works that were within the scope of the license, whereas here it's an argument about the amount. I think what I'm hearing you say is even if no money was flowing up, they're stuck with their contract claim. They don't have against the UA, rather than their copyright claim. Yeah, it's a two-part answer, and I was addressing the first part, which is even if in this structure, yes, but that's not what's alleged here. What's alleged here is that Urban Audiobooks has the payment obligation. Urban Audiobooks contracted with Terry Woods Publishing. They have the right to then distribute and sublicense and allow others and provide catalog and wholesale sales with the expectation that there will be downstream sales. There's no allegation that Urban Audiobooks was giving away distribution rights for free. The allegation is that the pricing model of the downstream distributors, Audible and Amazon, for example, isn't to their liking because arguably when someone has a subscription, they're not paying a per unit price. Well, no, that's not the argument. I think that the argument is that the downstream payer is not paying any royalties on some distributions that go beyond the scope of the license because there's no royalties. So if you look closely at the allegations of the complaint, the most they say is what we've heard now, which is we're not sure? Right. So maybe you can answer this question. Let me give you a couple of hypotheticals and you can tell me how this Audible, I don't care about the pricing piece of the ultimate consumer. What I care about is what royalties flow back upstream as a result of these uses. So hypothetical number one is a work is within the orbit of the members get to listen to this for free. You don't even have to use a token. Does that generate an upstream payment? Let's not even call it a royalties. An upstream payment for the distribution of that work in that context. It does, your honor. Okay. And that's based on the minutes and all of that. Yeah. Well, there are two models and there's two sort of levels of subscription. One gets you sort of like a Netflix account where you can get, except it's books, audio books. But where you have a library to choose from and you don't have to redeem any sort of credit or purchase price for that autumn. It's part of your subscription. That's the Audible Plus catalog. And then there are other titles for which you can redeem a credit that you receive at the base or purchase a la carte at a discount, which you receive as part of your membership. And either of those generate royalties under different contracts with different publishers and distributors and individual authors. But they generate royalties to ultimately to copyright. All right. So now let me go to hypothetical two. Within the subscription model, a listener dips in and listens to four minutes and 59 seconds. And then the next day they dip in and listen to the next four minutes and 59 seconds. And they do that seriatim until they've listened to the whole book. Does that generate an upstream payment? It does, Your Honor. The qualified listens rule is about an initial, you know, trying it, you don't like it. Sort of like I start a song on Spotify. So you get one five-minute dip. Yeah. You don't get to serially listen to a book in five-minute increments. That would be a listen, which generates a per-minute base. And I assume that none of this is, of course, in the record. And I'm asking you sort of that. And is that because has that information been provided to? So I'm not sure of all the communications between. There was Urban Audiobooks, of course, was in communication with Terry Woods Publishing. Then there was Blackstone, another intermediary. And then ultimately Audible and Amazon. And so Audible and Amazon's position is this is a publishing dispute between you and your contracting party. We had a license to do what we're doing. You guys should work it out as a contractual matter. All right. But, I mean, so assuming that's true. Let's assume that's true. So what does that mean in the state court then? I mean, what is your position with respect to which portion of Section 2 of the license covers subscription streaming? So, again, there's a lot that's not in the record. I think what's based. There's a lot that's not in the record. I get that. But what is in the record there? Is it at most some uncertainty about how to pay for something, not whether it was within the license? Well, there's no uncertainty that it's not 2C, right? Everybody agrees on that. So is the whole ballgame whether this is 2A or 2B? That could be part of a commercial dispute. As I understand it, Urban Audiobooks paid at the higher of those two rates, at the 25% rate, which is for Internet downloads. Now, I will say, since I was asked hypotheticals that let me talk about business realities earlier, I will say that with many of these subscription plans, a user can stream audio without any download and can also download something, for example, to their phone to listen to a book on the plane or the bus where they have no cell service. So I could imagine in a state court proceeding some argument about, gee, this is hard to, it's sort of, it can be a mix. How should we account for this? But none of that would create a copyright claim. That would just create a difference and a result for a judge to determine whether it's 25% or 10%. In New York UCC, this is New York law, right? Correct, Your Honor. And so New York UCC generally has creative ways to resolve those kinds of disputes. Yes. Am I right that you were arguing earlier that even if it wouldn't fit under A or B, if it was a catalog or download, that it wouldn't be a copyright claim? Yes, Your Honor. That means you could give away the items for free without the compensation that you were just describing. No, I think that if it doesn't fit cleanly into it because the rights granted included any future contrivance medium or means, now known or hereafter developed, you could end up in a situation with some new technology that doesn't fit squarely within this. I mean, I think with the language of this, it fits in A, which is just other retail sales and rentals of audio recordings. But if you were in a scenario with some technology that couldn't fit squarely, I think you'd have to choose one of those royalty rates. The answer wouldn't be it's free. But if you look at the license grant in 1, there's no condition, there's no conditional language, you know, subject to full payment in compliance with Section 2. There's just the right to distribute in any medium and means now known or hereafter developed. And so that's why I think the remedy would be contractual and not a copyright one. Getting back to where I was starting, Your Honors, Spinelli was an unusual case, as the opinion itself noted, but it reinforced the basic rule of Graham versus James and other cases, that most royalty disputes are contract matters and courts should not start down a slippery slope in which any royalty dispute can be converted to a copyright claim. Your Honors, if this case can proceed as a copyright case, then any case can, and we respectfully urge the court to affirm. All right. Thank you, Mr. Wakefield. We'll now hear from Mr. Ewing for two minutes of rebuttal. In Spinelli, what this court held was that where the license authorized two types of complementary distribution, it was wrong for the district court to hold as a matter of law that there were other types of complementary distribution that were authorized. In this case, if you look at the listings for Ms. Wood's works that appear in the record, they are being advertised as being on sale for free when the various words used in the agreement say that this was not authorized. Section 3 requires the payment of royalties. But not free in the sense that you have to be a subscriber to do this, right? You do have to be a subscriber. But when they're advertised as $0 and available for redemption of credits with no payment to Ms. Woods, as far as we're aware, that exceeds the scope. That's completely different than what Mr. Wakefield just said. So you're calling him a liar? I'm saying that based on what we can see, we're taking them at their word, the way these things were listed on Amazon. So you're saying you're getting no royalties at all for these subscription streaming services? We don't know how we are getting royalties. But you do know you're getting some royalties, right? You're an officer of the court, so I expect an answer to that. We are getting some royalties. The question is on what? And does it cover everything? And the answer to that is we don't know, but we have alleged, in fact, that we are not. Because all we can tell, again, when we tried to do this audit, when we tried to find out what was going on, we were threatened by Urban Audio Books, and Blackstone said, don't talk to us, talk to Urban Audio. So this is the problem with dismissing this case at this stage. But why aren't all these problems solved by just going to New York State court and having a contract dispute and then working this out? Because the law allows for the recovery of copyright damages when the scope of a license grant has been infringed or exceeded. No, no, I know what Spinelli says. I understand what the law says. But you keep suggesting that you're without a remedy if we conclude that this is not a scope of the license problem. That would be true of any case where a copyright license or a licensee, excuse me, exceeds the scope of its grant. There would be no copyright infringement claims in that circumstance if that were the law, but it is not. I'm out of time.  Okay, thank you. We will reserve the decision.